UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, acting in its capacity as liquidating agent for the Hmong American Federal Credit Union,<br><br>Plaintiff,<br><br>v.<br><br>TRUE YANG VANGH and NKAJLO VANGH,<br><br>Defendants. | Case No. 15-CV-3871 (PJS/HB)<br><br>ORDER |

Plaintiff National Credit Union Administration ("NCUA") is a federal agency that regulates and supervises credit unions. Defendants True Yang Vangh and Nkajlo Vangh (a married couple) operated the Hmong American Federal Credit Union ("HAFCU"). The NCUA recently filed this lawsuit against the Vanghs, accusing them of stealing about $1.8 million from the HAFCU. This matter is before the Court on the NCUA's motion for a preliminary injunction [ECF No. 12] and the Vanghs' motion to stay proceedings [ECF No. 19]. The NCUA seeks a preliminary injunction to freeze the Vanghs' assets and prohibit them from destroying evidence. The Vanghs oppose this motion and ask the Court to stay the case because the federal government is conducting a criminal investigation into the conduct that is at issue in this case.

The Court heard argument on both motions on October 30, 2015. For the reasons that follow (as well as the reasons provided by the Court at the hearing), the Court grants the motion for preliminary injunction in part and denies it in part. The Court also denies defendants' motion to stay proceedings.

I. BACKGROUND[1]

True Yang Vangh and Nkajlo Vangh held various positions of authority at the HAFCU. True served as CEO and directed the HAFCU's daily affairs. Peeples Aff. ¶ 10. Nkajlo chaired the HAFCU's board. *Id.* ¶ 8. Together, they had access to all of the credit union's records and financial information. *Id.* ¶ 7.

In February 2011, the NCUA determined that the HAFCU had violated federal regulations, lacked oversight, and had large unsecured loans. Davis Aff. ¶ 3. NCUA examiner Jennifer Davis visited the HAFCU on April 14 and 15, 2011 to examine its records. *Id.* ¶¶ 4-5. The Vanghs were evasive; they failed to produce some requested records, and Nkajlo falsely said the credit union's copier was broken. *Id.* ¶ 5.

Davis returned to the HAFCU on April 18, 2011, but Nkajlo Vangh told her to leave. *Id.* ¶ 6. The next day, Davis came back with more NCUA employees and a letter

---

[1]The Court treats the NCUA's evidence as undisputed for purposes of ruling on its motion for a preliminary injunction. The Vanghs say that they "vehemently deny the NCUA's claims," Vangh Aff. ¶ 12, but the Vanghs have not submitted affidavits or other evidence contradicting any of the evidence submitted by the NCUA. The Vanghs will, of course, have the opportunity to dispute the NCUA's allegations as the case goes forward.

from the NCUA's regional director. *Id.* ¶ 7. Davis discovered that many records had disappeared. *Id.* When confronted about the missing records, Nkajlo was again evasive; he first accused Davis of having stolen the records and then said that the records had been accidentally shredded. *Id.* ¶ 8.

The NCUA put the HAFCU into conservatorship on May 4, 2011. Peeples Aff. ¶ 4. Two weeks later, the NCUA put the HAFCU into involuntary liquidation because the HAFCU had become insolvent. *Id.* ¶ 5. NCUA staff then inventoried the HAFCU's records, and found that important records were missing. *Id.* ¶¶ 13-14.

Among the missing documents were records pertaining to eight large loans totaling $1.8 million. *Id.* ¶ 15. These eight loans were purportedly secured by 76 share accounts of HAFCU members—some real, others fictitious. *Id.* ¶ 16. Dozens of these members later told the NCUA that they had not pledged their shares, did not know the purported borrowers, and had not signed any paperwork related to the loans. *Id.* A solvency evaluation showed that $1.8 million was unaccounted for when the NCUA liquidated the HAFCU and that the proceeds of the eight loans went to accounts that the Vanghs controlled. *Id.* ¶ 17.

An independent forensic accountant's investigation showed how the Vanghs executed their fraud. Lillie Aff. ¶ 9. The Vanghs created fictitious loans and secured the loans with the shares of HAFCU members without the knowledge of those

members.  *Id.*  The Vanghs then withdrew the loan proceeds for business and personal use.  *Id.* ¶¶ 10, 15.  To keep the loans current and avoid detection, the Vanghs created new loans and used the proceeds of the new loans to make payments on the older loans.  *Id.* ¶ 13.

In May 2013, the Vanghs learned that the NCUA was investigating them for fraud.  Vangh Aff. ¶ 12.  The NCUA told the Vanghs that it would refer the case to the Department of Justice.  *Id.* ¶ 13 & Ex. 3.  The Vanghs' counsel then learned of an FBI investigation into his clients' operation of the HAFCU.  Wolter Aff. ¶ 2.  In June 2014, the FBI case agent told the Vanghs' counsel that the FBI had not "forgotten about" the Vanghs.  *Id.* ¶ 5.

The NCUA initiated this civil case by filing a motion for an ex parte temporary restraining order ("TRO") on October 16, 2015.  The Court granted the motion and entered the TRO the same day.  The TRO froze the Vanghs' assets, required them to complete financial disclosures, and prohibited them from destroying evidence.  Shortly after the TRO was entered, the Vanghs moved the Court to dissolve or modify the TRO, and the NCUA moved the Court for entry of a preliminary injunction.

The Court heard argument on the motions on October 30, 2015.  At the conclusion of the hearing, the Court informed the parties of the substance of its rulings on the pending motions, and then extended the TRO by a few days to allow the parties

-4-

to negotiate the terms of a preliminary injunction that would reflect the Court's rulings. The parties have submitted proposed language, and the Court thanks the parties for their assistance.

## II.  ANALYSIS

### *A.  Preliminary Injunction*

A court typically considers four factors in deciding whether to grant a preliminary injunction:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest.  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction."  *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).  Preliminary injunctions are extraordinary remedies, and the movant bears the burden of establishing its entitlement to an injunction under the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Congress, though, has exempted the NCUA from the irreparable-harm requirement.  12 U.S.C. § 1787(b)(2)(H)(i) ("Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any [NCUA injunctive] proceeding . . . without

regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate."). The Vanghs argue that the NCUA still must show some imminent harm to obtain a preliminary injunction. The statute's language, though, is clear: When the NCUA sues for a preliminary injunction, it need not show any "irreparable and immediate" harm. The Court thus disagrees with *National Credit Union Administration Board v. Concord Limousine, Inc.*, 872 F. Supp. 1174, 1177 (E.D.N.Y. 1995), which relied on legislative history and policy arguments rather than the plain text of the statute. Accordingly, the Court considers only the first, third, and fourth *Dataphase* factors.

1. Asset Freeze

*a. Likelihood of Success on the Merits*

The NCUA has demonstrated a likelihood of success on the merits. The NCUA has submitted several detailed affidavits providing evidence that the Vanghs converted credit-union funds and defrauded shareholders. The Vanghs say that they "vehemently deny the NCUA's claims," Vangh Aff. ¶ 12, but they have not submitted any evidence in support of their denial. Based on the record as it now stands, the NCUA has shown that it is very likely to succeed on the merits.

*b. Balance of Harms*

The balance of harms would favor the Vanghs if the Court were to entertain the NCUA's request for a total freeze on their assets. True, the NCUA stands to lose up to $1.8 million if the Vanghs *have* $1.8 million and dissipate those funds during the course of this litigation. But the NCUA has submitted no evidence that the Vanghs are sitting on $1.8 million, and if the Vanghs were planning to dissipate such funds, they almost certainly would have done so by now. Four-and-a-half-years ago, the NCUA learned that the Vanghs had engaged in questionable business practices, kicked an auditor out of their office, and shredded loan documents. Two-and-a-half years ago, the NCUA referred this matter for criminal prosecution. But the NCUA did not seek any form of relief against the Vanghs until two-and-a-half *weeks* ago. If the Vanghs were going to dissipate assets or destroy evidence, they would have done so four-and-a-half years ago when the NCUA took over their credit union or two-and-a-half years ago when the FBI came calling. The NCUA has presented no evidence that the Vanghs have actually dissipated assets, and no evidence that the Vanghs are likely to do so now that they have been sued.

At the same time, a total asset freeze would severely harm the Vanghs. They would be unable to pay basic living expenses. Moreover, they own four businesses, Vangh Aff. ¶ 4, and a total asset freeze would force them to close those businesses, lay

off their employees, and lose their clients to competitors. Clearly, the balance of harms militates strongly against a complete asset freeze.

The same cannot be said about a *partial* asset freeze. The Vanghs would suffer little harm from an asset freeze that would allow the Vanghs to pay for reasonable living, business, and legal expenses, but not make large discretionary purchases (such as buying a new car or remodeling their home). Such a freeze would also ensure that the Vanghs preserve their assets so that they will have money to pay damages.

### c. Public Interest

The public-interest factor is a draw if the Court considers a total asset freeze. The public stands to gain financially if the Vanghs have $1.8 million in assets and do not dissipate those assets during the course of this litigation. But the Vanghs' businesses employ 109 people, *id.*, and the Vanghs will be unable to pay their employees if the Court completely freezes the Vanghs' assets. Moreover, the Vanghs' healthcare, personal-care, and adult-day-care businesses serve over 200 clients, *id.*, who will likely suffer if the Vanghs' businesses suddenly cease operating.

A partial asset freeze, though, will prevent the Vanghs from dissipating the assets that they allegedly stole while allowing them to continue to run their businesses. And the public will benefit if the Vanghs continue to operate their businesses. The employees will continue to work, the clients will continue to have their needs met, and

the Vanghs will presumably continue to earn profits that they can use to pay any judgment entered in this lawsuit.

*d. Conclusion*

Considering the three applicable *Dataphase* factors, the Court grants in part the NCUA's motion for a preliminary injunction that freezes the assets of the Vanghs. As described below, the Court will freeze the Vanghs' assets, but permit them to pay reasonable living, business, and legal expenses. The Court will also require the Vanghs to promptly disclose any expenditures over $100 to the NCUA, so that the NCUA can ensure that the Vanghs' expenditures comply with this order.

2. Document Preservation

The *Dataphase* factors clearly support a document-preservation order. The NCUA has shown a likelihood of success on the merits, as discussed above. Moreover, the NCUA has submitted uncontradicted evidence that the Vanghs have destroyed evidence in the past. A document-preservation order does no real harm to the Vanghs and obviously benefits both the NCUA and the public.

3. Security

A plaintiff who requests a preliminary injunction normally must post a bond.

Fed. R. Civ. P. 65(c). But Rule 65(c) excuses the United States, its officers, and its

agencies from the bond requirement. *Id.* As a United States agency, the NCUA falls within this exception, so it need not provide security.

*B. Motion to Stay*

The Vanghs argue that the Court should stay the case because the federal government is conducting a criminal investigation into the conduct that is at issue here and, if the suit proceeds, the Vanghs might need to choose between asserting their Fifth Amendment privilege and vigorously defending this lawsuit. The Court agrees that the Vanghs have raised legitimate Fifth Amendment concerns, but those concerns can be accommodated without staying the case. Much of the NCUA's discovery—for example, subpoenaing records from or taking the depositions of third parties—will not implicate the Vanghs' Fifth Amendment privilege.

The Court has asked the NCUA to do as much discovery as possible without seeking sworn testimony or other information directly from the Vanghs. When the NCUA has completed all such discovery and concludes that it needs to seek information from the Vanghs directly, it should bring the matter to the attention of Magistrate Judge Bowbeer.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Plaintiff's motion for preliminary injunction [ECF No. 12] is GRANTED IN PART and DENIED IN PART.

2.  Defendants True Yang Vangh and Nkajlo Vangh and any businesses, corporate entities, affiliates, subsidiaries, divisions, successors, or assigns in which they have a controlling interest; their agents (including financial and banking institutions and other entities having possession or control of the defendants' assets); their officers; their employees; and all persons in active concert or participating with the defendants in their affairs are hereby restrained and enjoined from:

   a.  transferring, converting, encumbering, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, or otherwise disposing of, in any manner, assets in real or personal property, owned, gained, or acquired by the defendants up to and including $1.8 million, except for:

      i.  reasonable and ordinary personal living expenses;

      ii.  reasonable and ordinary business expenses;

      iii.  reasonable attorneys' fees; and

      iv.  other funds specifically authorized by order of this Court; and

   b.  opening or causing to be opened any safe-deposit boxes or storage facilities titled in the name of the defendants, or subject to access by the defendants or under their control, without providing plaintiff's counsel

        prior notice and an opportunity to inspect the contents in order to determine that they contain no assets covered by this preliminary injunction, unless specifically authorized by order of this Court.

3. By the 15th day of each month, defendants must provide a sworn statement to plaintiff's counsel detailing:

    a.    each personal living expenditure exceeding $100 made during the preceding month; and

    b.    each payroll and other business expenditure exceeding $100 made during the preceding month related to any of the following:

        i.    Western Village, LLC;

        ii.    Hmong Elite Home Care, Inc.;

        iii.    Western Deli;

        iv.    Twin Cities Home Health Services, LLC/TCH Health Service; and

        v.    any other business operated or owned by defendants.

4. Defendants and their officers, agents, servants, employees, attorneys, and all persons or entities directly or indirectly under their control or under common control with them, and all other persons in active concert or participation with them who receive actual notice of this order, are hereby restrained and enjoined from destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any

manner, directly or indirectly, any documents that relate to the personal finances, the business practices, or the business or finances of any of the defendants, or to the business practices or finances of entities that are directly or indirectly under control of any of the defendants, or under common control with any of the defendants.  Any third party having such documents in its possession, custody, or control, and which is served with a copy of this order, or otherwise has actual or constructive knowledge of this order, is also restrained and enjoined from destroying, erasing, mutilating, concealing, altering, transferring or otherwise disposing of, in any manner, directly or indirectly, such documents.

     5.  Defendants' motion to stay proceedings [ECF No. 19] is DENIED.

     LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November 3, 2015            s/Patrick J. Schiltz
                                                       Patrick J. Schiltz
                                                       United States District Judge